**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CORSICA LAMBERT, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 1:24-00397-N** |
| | ) | |
| **MOBILE COUNTY COMMISSION, *et al.*,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION**

This civil action is before the Court on the "Motion for Summary Judgment" under Federal Rule of Civil Procedure 56 (Doc# 65), with separately-filed supporting brief (Doc# 66) and evidentiary material (Docs# 63, 64), filed November 25, 2025, by Defendants Eric Blackwood, Sheriff Paul Burch, Daniel Franklin, Joshua Grimm, Brandon Light, Michael Pozobyt, Curtis Renfroe, Jonathan Rivers, and J.T. Thornton. In accordance with the Court's briefing schedule (Docs# 68, 75), the Plaintiffs—Corsica Lambert, Brittnay Powe, and Jason Napier—filed a response in opposition to said motion (Doc# 76), with separate supporting evidentiary material (Docs# 77, 78), and the movant Defendants filed a reply to the response (Doc# 83).

By order entered September 29, 2026 (Doc# 101), the Court (1) found the motion for summary judgment moot as to Franklin, Light, and Pozobyt, due to the Court having dismissed the claims against them under Federal Rule of Civil Procedure 41(a)(2) on motion of the Plaintiffs after briefing on the present motion closed, and (2) granted it as to Burch, Blackwood, Grimm, Renfroe, Rivers, and Thornton (hereinafter, collectively "the Deputy Defendants"), dismissing all claims

against them addressed by the motion. This memorandum sets out the Court's reasoning on the grant of summary judgment for the Deputy Defendants.

## I. *Summary Judgment Legal Standards*

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'material' if it might affect the outcome of the suit under governing law and it is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013) (quotations omitted). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

"Summary judgment is only appropriate if a case is 'so one-sided that one party must prevail as a matter of law.' " *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (quoting *Anderson*, 477 U.S. at 251-52) (citation omitted). However, a " 'mere scintilla' of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) (per curiam). In other

words, "there must be enough of a showing that the jury could reasonably find for that party … Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (quotations omitted).

"[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *Jackson v. West*, 787 F.3d 1345, 1352 (11th Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration adopted) (quotations omitted)). *See also Allen*, 121 F.3d at 646 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (quotations omitted)); *Cottrell v. Caldwell*, 85 F.3d 1480, 1486 n.3 (11th Cir. 1996) ("In determining the facts for summary judgment purposes, we, like the district court, are required to view the evidence in the light most favorable to the plaintiff. When that is done, a pure issue of law is created."). "The Court 'must avoid weighing conflicting evidence or making credibility determinations.' " *Ave. CLO Fund*, 723 F.3d at 1294 (quoting *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000)). However, " 'an inference based on speculation and conjecture is not reasonable.' " *Id.* (quoting *Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985)).

"Where … the non-moving party bears the burden of proof on an issue at trial, the moving party, in order to prevail, must do one of two things: show that the non-moving party has no evidence to support its case, or present 'affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial.' "

*Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437–38 (11th Cir. 1991) (en banc)). "Once the movant adequately supports its motion, the burden shifts to the nonmoving party to show that specific facts exist that raise a genuine issue for trial." *Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 815 (11th Cir. 2010). "For issues on which the non-moving party will bear the burden of proof at trial, the non-moving party must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.' " *Hammer*, 20 F.3d at 1141 (quoting *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993)).

"When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Four Parcels of Real Prop.*, 941 F.2d at 1438 (citations and quotations omitted). *Accord, e.g.*, *Baker v. Upson Regional Medical Center*, No. 22-11381, 2024 WL 1003534, at *4 (11th Cir. Mar. 8, 2024) (per curiam).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "The nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." *Allen*, 121 F.3d at 646 (quotation omitted). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Id.* (quotation omitted). However, "[i]n opposing a motion for summary judgment, 'a party may not rely on his pleadings to avoid judgment against him.' " *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (en banc) (quoting *Ryan v. Int'l Union of Operating Eng'rs, Local 675*, 794 F.2d 641, 643 (11th Cir. 1986)). Moreover, "[c]onclusory allegations and speculation are insufficient to create a genuine issue of material fact." *Valderrama v. Rousseau*, 780 F.3d 1108, 1112 (11th Cir. 2015) (citing *Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.")).

Additionally, a district court is only required to consider "the cited materials" when deciding a summary judgment motion. Fed. R. Civ. P. 56(c)(3). While the court

also "may consider other materials in the record[,]" *id.*, "[m]aking district courts dig through volumes of documents and transcripts would shift the burden of sifting from petitioners to the courts…[D]istrict court judges are not required to ferret out delectable facts buried in a massive record," *Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) (habeas corpus proceedings), and " '[t]here is no burden upon the district court to distill every potential argument that could be made based on the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.' " *Solutia, Inc. v. McWane, Inc.*, 672 F.3d 1230, 1239 (11th Cir. 2012) (per curiam) (quoting *Resol. Tr. Corp.*, 43 F.3d at 599).

## II. *The Complaint*[1]

The Plaintiffs initiated this action on October 25, 2024, by filing a complaint with the Court, *see* (Doc# 1); Fed. R. Civ. P. 3, alleging causes of action against the Deputy Defendants and others arising out of the Plaintiffs' arrests following a traffic stop, and the subsequent search of Lambert and Napier's home, all occurring in Semmes, Mobile County, Alabama, on October 26, 2022. Defendant Burch is the current Sheriff of Mobile County but, like each of the other Deputy Defendants, was a Mobile County deputy sheriff at all times relevant to the complaint.

[1] The Plaintiffs did not amend their complaint once as a matter of course within the time permitted by Federal Rule of Civil Procedure 15(a)(1)(B), and they have three times been denied leave to amend under Federal Rule of Civil Procedure 15(a)(2). (*See* Docs# 52, 56, 58, 73, 84, 90). Accordingly, the initial complaint (Doc# 1) remains the operative pleading in this action.

Count I of the seven-count complaint asserted claims solely against the Mobile County Commission, which has been voluntarily dismissed as defendant to this action. (*See* Docs# 80, 90). Counts II through VI, collectively, assert causes of action under 42 U.S.C. § 1983 against the Deputy Defendants for violations of the Plaintiffs' rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Count VI asserts § 1983 Fourth Amendment and state-law claims for false imprisonment against the Deputy Defendants except for Burch, and Count VII asserts state-law claims for malicious prosecution against the Deputy Defendants.

### III. *Facts on Summary Judgment*[2]

On October 24, 2022, the Mobile County Sheriff's Office (MCSO) obtained an arrest warrant for Joseph Timmons for the shooting death of Triston Michal Bohannon three days prior, with the warrant initially listing an address for Timmons in Chickasaw, Alabama, that Timmons provided when he was booked into Mobile County Metro Jail on a different matter. (Doc# 63-1, PageID.430; Doc# 63-2, PageID.597; Doc# 71-2, PageID.767-768). Detectives in MCSO's Major Crimes Unit were in charge of investigating the crime, while deputies in MCSO's Special Operations Unit were involved in in apprehending Timmons. (Doc# 63-1, PageID.453-454).

[2] As explained previously, on summary judgment a court cannot make credibility determinations, and must view the facts and draw all reasonable inferences in the light most favorable to the non-movants. Accordingly, what the Court finds as "facts" for purposes of ruling on the present motion for summary judgment "may not be the actual facts" that would be determined at trial. *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir.) (quotation omitted), *opinion modified on reh'g as to other issues*, 30 F.3d 1347 (11th Cir. 1994) (per curiam).

Defendant Grimm, with the Major Crimes Unit, was the lead investigator for the case. (Doc# 63-1, PageID.476). Grimm verified through ALACOP that Timmons had listed the address of 9711 Brooklyn's Way, Semmes, Alabama 36595, as his residence on an updated driver license issued October 3, 2022 (Doc# 63-2, PageID.622; Doc# 64, PageID.662-663; Doc# 72-2, PageID.769), which was also the residence of Lambert, Timmons's mother. (Doc# 72-2, PageID.770). Grimm believed it likely that a then-18- or 19-year-old like Timmons, who probably had "less resources than an adult further along in their life[,]" would "go back to a place that he feels safe," such as "his mother's house[,]" after committing a serious crime and experiencing a "high sense of stress" from knowing law enforcement is searching for him. (Doc# 63-1, PageID.458, 465-66). Based on these circumstances, Grimm believed 9711 Brooklyn's Way to be Timmons's "most likely address." (Doc# 63-1, PageID.466). Therefore, on October 26, 2022, with the approval of a Mobile County magistrate, Grimm updated the warrant to show Timmons's address as 9711 Brooklyn's Way. (Doc# 63-2, PageID.597; Doc# 64, PageID.662-663).

Meanwhile, an FBI Safe Streets Task Force ("the FBI Task Force"), which included MCSO deputy Joshua Coleman, was conducting its own investigation of Timmons, which included surveilling 9711 Brooklyn's Way. (Doc# 63-1, PageID.468-470).[3] In the late morning or early afternoon of October 26, 2022, Coleman and two FBI special agents knocked on the door of 9711 Brooklyn's Way, then knocked again

---

[3] While MCSO officers could be assigned to it, the FBI Task Force operated independently of the MCSO and focused on crimes with a federal nexus. (Doc# 63-2, PageID.592).

after receiving no response. (Doc# 63-2, PageID.592). Plaintiff Napier eventually answered the door. (*Id.*). One of the FBI agents identified himself and asked if Timmons was inside the residence. Napier, appearing nervous and standoffish, denied that Timmons was there, and refused consent to search the residence. (*Id.*). Coleman and the agents then left the residence to assist with another operation. (*Id.*, PageID.593). Knowing that Grimm was the lead investigator on MCSO's investigation of Timmons, Coleman contacted Grimm and informed him, based on their interaction with and observation of Napier, he believed Timmons was likely at 9711 Brooklyn's Way. (*Id.*).

Coleman and other FBI Task Force members returned to 9711 Brooklyn's Way approximately an hour after leaving and resumed surveillance. (*Id.*). Napier and Lambert were seen entering and exiting the residence multiple times, while Napier drove around the neighborhood in one of the vehicles parked in the driveway, stopping to take pictures of the FBI agents' vehicles. (*Id.*). Napier also stood in the driveway drinking beer and waving at the agents. (*Id.*). Coleman believed Napier's activities to be attempts to distract the agents. (*Id.*). At one point, Coleman also observed an occupant of the residence backing a vehicle around other cars in the driveway and into the garage, then closing the garage door. (*Id.*, PageID.593-594).

Later in the afternoon, Napier approached Coleman and the agents, asking when the MCSO was planning on executing a warrant on the residence. (*Id.*, PageID.594). One of the agents again asked Napier about Timmons's whereabouts, but Napier again denied any knowledge and demanded information about the

investigation. (*Id.*). Napier again appeared to be standoffish and nervous in this interaction. (*Id.*). Coleman and the other FBI Task Force members concluded their surveillance and left 9711 Brooklyn's Way around 4:00 p.m. (*Id.*). Coleman contacted Grimm again, informed him of the interactions with Napier, and reaffirmed his belief that Timmons was likely in the residence. (*Id.*).

The MCSO Special Operations team assigned to the Timmons warrant, which included Defendants Blackwood, Renfroe, and Rivers, were staging operations about 1.5 miles from 9711 Brooklyn's Way in preparation for executing the arrest warrant on the residence. (Doc# 63-1, PageID.437, 501). Both Renfroe and Rivers were aware that the address on the arrest warrant had been changed to 9711 Brooklyn's Way, and at least Renfroe was aware that Timmons had provided that address on his driver license and that his mother Lambert lived there. (*Id.*, PageID.429, 431, 508-510). Just before the team planned to execute the warrant, however, another deputy sheriff who was surveilling the residence radioed Rivers to report that a white Mercedes had just pulled out of the closed garage and was leaving the residence. (Id., PageID.433-434, 511, 603, 613). Believing that this was an attempt to sneak Timmons out of the residence in the vehicle, Renfroe and Rivers left the staging area to follow the white Mercedes. (*Id.*, PageID.511-512). Rivers reached the Mercedes first, stopping the vehicle in a church parking lot around 6:30 p.m., after which Renfroe and Franklin arrived at the scene. (*Id.*, PageID.511-512, 526; Doc# 63-2, PageID.626). Rivers physically removed Lamberts from the driver's seat, over Napier's attempts to

physically keep her in the car, while Renfroe and other officers eventually removed Napier from the passenger side. (*Id.*, PageID.489-491; Doc# 63-2, PageID.614).

During the traffic stop, Napier called his mother, who then contacted Napier's sister, Plaintiff Powe. (Doc# 63-2, PageID.531, 551-552). Powe, her mother, and her husband all went to the scene of the stop. (*Id.*, PageID.552-558). Powe and her husband arrived after her mother, who was standing outside her car talking with two detectives when they arrived. (*Id.*, PageID.559, 564). Two deputies approached Powe, instructed her to put her hands behind her back, handcuffed her, and told her husband to move their car because he was blocking the intersection. (*Id.*, PageID.560-562). Powe was handcuffed for about three to five minutes, until one of the detectives who had been standing with Powe's mother came over, removed the handcuffs, walked Powe across the street, and told her to stay there. (*Id.*, PageID.562-567). Timmons was not inside the vehicle with Lambert and Napier.

The Special Operations team executed the arrest warrant on 9711 Brooklyn's Way by forced entry, with Renfroe, Rivers, and Blackwood all entering the residence at various times during the search of the residence. (*Id.*, PageID.606, 609-610, 615-616; Doc# 63-1, PageID.523).[4] Grimm arrived at the scene as the Special Operations team was making entry, and entered the residence after being informed there was evidence in plain view he might want to look at. (Doc# 63-1, PageID.473-475). Based on this evidence, Grimm called Defendant Thornton, a Sergeant with the MCSO's

[4] There is dispute in the record about when officers first entered the residence relative to the traffic stop. See n.16, *infra*.

Special Investigations Unit, to obtain a search warrant. (Doc# 63-2, PageID.579-580). Thornton prepared the warrant, a judge signed it at approximately 8:40 p.m., and it was executed on the residence at approximately 9:19 p.m. (Doc# 63-2, PageID.616, 643-649). Timmons was not found at 9711 Brooklyn's Way either.

Rivers and Renfro ultimately arrested Lambert and Napier, respectively, at the scene of the traffic stop for disorderly conduct and resisting arrest, with Napier also being arrested for not having pistol permit for a firearm found in the Mercedes that Napier claimed was his. (Doc# 63-1, PageID.493, 517-518; Doc# 63-2, PageID.546-547, 604-605). Powe was arrested for disorderly conduct and two outstanding warrants for failing to appear on speeding tickets. (Doc# 63-2, PageID.605, 635, 637, 639, 641). All three Plaintiffs were transported to the Mobile County Metro Jail and bonded out later that evening. (*Id.*, PageID.545). Criminal complaints were filed against each of the Plaintiffs for their respective arresting offenses (except for Powe's outstanding warrants) on October 31, 2022, but the District Attorney subsequently nolle prossed those charges. (Doc# 63-1, PageID.520-521; Doc# 63-2, PageID.635, 651-659).

## IV. ***Analysis***[5]

"42 U.S.C. § 1983[[6]] authorizes redress" "for violations of…constitutional and statutory rights…; that section is not itself a source of substantive rights, but a

[5] The undersigned finds that a detailed recitation of factual findings is unnecessary, and discusses only the evidence necessary to address the arguments raised in the present motion.

[6] Section 1983 provides, in relevant part: "Every person who, under color of any

method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 145 n.3 , 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979). "The first inquiry in any § 1983 suit, therefore," is "to isolate the precise constitutional violation with which [a defendant] is charged." *Id.* at 140.

The Plaintiffs' § 1983 claims against the Deputy Defendants are for (1) violations of the Fourth Amendment right against unreasonable searches and seizures based Lambert and Napier's traffic stop, all Plaintiffs' arrests, the search of Lambert and Napier's residence, and the allegedly excessive damage done to the residence during the search; (2) violations of the Due Process Clauses of both the Fifth and Fourteenth Amendments; and (3) violations of the Fourteenth Amendment's Equal Protection Clause. The Deputy Defendants have moved for summary judgment on all claims but the excessive-damage-to-the-residence claims.

The Deputy Defendants, except for Burch,[7] argue that they are entitled to qualified immunity on all of the § 1983 claims that are the subject of the present motion.

---

statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…"

[7] Burch has argued that the § 1983 claims against him are due to be dismissed because he was not the Mobile County Sheriff during, and was not otherwise involved in, the underlying events.

> Qualified immunity "shields a government official from liability unless he violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 951 (11th Cir. 2019) (quoting *Foy v. Holston*, 94 F.3d 1528, 1532 (11th Cir. 1996)).[8] The defendant asserting the qualified immunity defense bears the initial burden of showing that he or she was acting within his or her discretionary authority. [*Piazza*, 923 F.3d] at 951. After the defendant makes this showing, the burden shifts to the plaintiff to show that qualified immunity is not appropriate. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).
>
> The Supreme Court has established a two-part test for evaluating a claim of qualified immunity. We must ask (1) whether, taken in the light most favorable to the injured party, the facts alleged show the officer's conduct violated a constitutional right; and (2) if the right violated under those alleged facts was clearly established at the time of the alleged violation. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S. Ct. 2074, 2080, 179 L. Ed. 2d 1149 (2011). Courts have discretion to consider these two questions in whichever order they find appropriate in light of the particular case. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009). For a plaintiff to overcome a claim of qualified immunity, both questions must be answered affirmatively. If the answer to one is "no," the court need not reach the other.

*Myrick v. Fulton Cnty., Ga.*, 69 F.4th 1277, 1297 (11th Cir. 2023) (footnote omitted).

Here, the Plaintiffs do not dispute that the Deputy Defendants who have asserted qualified immunity were all acting within their discretionary authority during the events underlying their claims,[9] and the record shows no genuine dispute

---

[8] As the Supreme Court has explained, "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 12, 142 S. Ct. 9, 211 L. Ed. 2d 170 (2021) (per curiam) (quotations omitted).

[9] "The term 'discretionary authority' covers 'all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority.' " *Hinson v. Bias*, 927 F.3d 1103, 1116 (11th Cir.

of material fact suggesting that they weren't. *See also* Ala. Code § 36-22-3(a)(4) ("It shall be the duty of the sheriff to[, w]ith the assistance of deputies as necessary, ferret out crime, apprehend and arrest criminals and, insofar as within their power, secure evidence of crimes in their counties and present a report of the evidence so secured to the district attorney or assistant district attorney for the county."), (b) ("Any of the duties of the sheriff set out in subsection (a) or as otherwise provided by law may be carried out by deputies, reserve deputies, and individuals employed as authorized in Section 14-6-1 as determined appropriate by the sheriff in accordance with state law."). Thus, the burden is on the Plaintiffs to show qualified immunity is not appropriate on their § 1983 claims.

With regard to showing that a federal right was "clearly established at the time of the alleged violation" of that right, courts are "not to define clearly established law at too high a level of generality. It is not enough that a rule be suggested by then-

---

2019) (quoting *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994) (internal quotation marks omitted)).

> Instead of focusing on whether the acts in question involved the exercise of actual discretion, we assess whether they are of a type that fell within the employee's job responsibilities. Our inquiry is two-fold. We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize.

*Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).

"In applying each prong of this test, we look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Id.* at 1266.

existing precedent…" *City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 12, 142 S. Ct. 9, 211 L. Ed. 2d 170 (2021) (per curiam) (citation omitted). Rather, a "right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.' " *Johnson v. City of Miami Beach*, 18 F.4th 1267, 1273 (11th Cir. 2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015) (quotation marks omitted)).

> The ordinary way of showing that a right is clearly established is by showing that "a materially similar case has already been decided." *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011). A plaintiff may also show that a "broader, clearly established principle should control the novel facts [of the] situation." *Mercado*, 407 F.3d at 1159 (citing *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)). To control a novel factual situation, a broad principle "must be established with obvious clarity by the case law so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Waldron v. Spicher*, 954 F.3d 1297, 1305 (11th Cir. 2020) (quoting *Loftus v. Clark-Moore*, 690 F.3d 1200, 1205 (11th Cir. 2012)). In either case, only prior decisions from the United States Supreme Court, this Court, or the relevant state supreme court can put officers on notice regarding the constitutionality of their actions. *See Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021).

*Bradley v. Benton*, 10 F.4th 1232, 1242–43 (11th Cir. 2021).

"A reasonable officer's awareness of the existence of an abstract right, such as a right to be free of excessive force or an investigatory stop without reasonable suspicion, does not equate to knowledge that his conduct infringes the right. 'If case

law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.' " *Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000) (quoting *Pickens v. Hollowell*, 59 F.3d 1203, 1206 (11th Cir. 1995)). "Additionally, the standard for determining if an officer violated clearly established law is an objective one and does not include inquiry into the officer's subjective intent or beliefs." *Id.*

**a. Fifth & Fourteenth Amendment Claims**

It is well established that the "fifth amendment [due process] protection attaches only when the *federal* government seeks to deny a liberty or property interest." *Knoetze v. U.S., Dep't of State*, 634 F.2d 207, 211 (5th Cir. Unit B Jan. 12, 1981);[10] *accord Jordan v. Mosley*, 298 F. App'x 803, 806 n.5 (11th Cir. 2008) (per curiam) (unpublished) ("[T]he Fifth Amendment applies only to Federal, not state, acts." (citing *Knoetze*, 634 F.2d 207, 211)). *See also Dusenbery v. United States*, 534 U.S. 161, 167, 122 S. Ct. 694, 151 L. Ed. 2d 597 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.' "); *Buxton v. City of Plant City, Fla.*, 871 F.2d 1037, 1041

[10] On "October 1, 1981 pursuant to the Fifth Circuit Court of Appeals Reorganization Act of 1980, P.L. 96-452, 94 Stat. 1995, … the United States Court of Appeals for the Fifth Circuit was divided into two circuits, the Eleventh and the 'new Fifth.' " *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc). "The Eleventh Circuit, in the *en banc* decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981." *Smith v. Shook*, 237 F.3d 1322, 1325 n.1 (11th Cir. 2001) (per curiam).

(11th Cir. 1989) ("The fifth amendment to the United States Constitution restrains the federal government, and the fourteenth amendment, section 1, restrains the states, from depriving any person of life, liberty, or property without due process of law."). Thus, the Plaintiffs cannot assert Fifth Amendment due process claims against the Deputy Defendants because they are all state actors.

The Plaintiffs have also failed to show violations of either the Due Process or Equal Protection Clause of the Fourteenth Amendment. Regarding the Equal Protection Clause, the present motion correctly argues that the complaint alleges no well-pleaded facts suggesting either an intent to discriminate or a discriminatory effect (*see* Doc# 66 n.1, PageID.691), and the Plaintiffs' response to the present motion does not cite evidence or make arguments demonstrating either. *See Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021) ("A successful equal protection claim under the Fourteenth Amendment requires proof of *both* an intent to discriminate and actual discriminatory effect.").

The Fourteenth Amendment Due Process Clause has both a procedural and a substantive component. *See Hillcrest Prop., LLP v. Pasco Cnty.*, 915 F.3d 1292, 1297 (11th Cir. 2019). The complaint does not make clear on which component(s) the Plaintiffs' Fourteenth Amendment due process claims are based, but on this record they fail regardless.[11] Regarding substantive due process, as the Deputy Defendants

[11] Indeed, it is not clear whether the Plaintiffs are actually asserting § 1983 claims for Fourteenth Amendment due process violations, or are simply recognizing that the Fourth Amendment is enforceable against the states through the Fourteenth Amendment's Due Process Clause, *see infra*. Because the Deputy Defendants' motion for summary judgment construes the complaint as asserting claims for Fourteenth

correctly note (*see* Doc# 66 n.1, PageID.691), any such claim appears to rely on the same allegations as the Plaintiffs' Fourth Amendment claims, and the Plaintiffs have not argued otherwise in opposition to the present motion. "Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). *Accord West v. Davis*, 767 F.3d 1063, 1069 (11th Cir. 2014); *Jordan v. Mosley*, 298 F. App'x 803, 805-06 (11th Cir. 2008) (per curiam) (unpublished). As for any procedural due process claim, such a claim "requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003). The Plaintiffs have failed to allege any non-conclusory facts suggesting constitutionally inadequate process, nor does their response to the present motion present any evidence or argument of inadequate process. *See Zinermon v. Burch*, 494 U.S. 113, 125, 110 S. Ct. 975, 108 L. Ed. 2d 100 (1990) ("In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*."); *Cotton v. Jackson*, 216 F.3d 1328, 1330–31 (11th Cir. 2000) ("In *McKinney v. Pate*, 20

---

Amendment due process violations and addresses their merits *vel non*, the undersigned will do likewise.

F.3d 1550, 1557 (11th Cir.1994) (en banc), we said that 'only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise.' It is the state's failure to provide adequate procedures to remedy the otherwise procedurally flawed deprivation of a protected interest that gives rise to a federal procedural due process claim. *See id*.…This rule (that a section 1983 claim is not stated unless inadequate state procedures exist to remedy an alleged procedural deprivation) recognizes that the state must have the opportunity to 'remedy the procedural failings of its subdivisions and agencies in the appropriate fora—agencies, review boards, and state courts' before being subjected to a claim alleging a procedural due process violation. *See McKinney*, 20 F.3d at 1560…" (footnote omitted)).

Accordingly, summary judgment is due to be granted in favor of the Deputy Defendants on the Plaintiffs' § 1983 claims for violations of the Fifth and Fourteenth Amendments, for failure to show that any such violations occurred.

**b. Fourth Amendment Claims**

**1. Burch**

"There are two ways in which an individual may be held liable under § 1983—he may be sued for his own personal actions ('direct liability'), or, under certain limited circumstances, for the actions of his subordinates ('supervisoral liability')…" *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1263 (11th Cir. 2004). "It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior

or vicarious liability." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (quotation marks omitted).

> Instead, to hold a supervisor liable a plaintiff must show that the supervisor either directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation. [*Cottone*, 326 F.3d at 1360].
>
> > The necessary causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. Alternatively, the causal connection may be established when a supervisor's custom or policy ... result[s] in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.
>
> *Id.* (internal quotation marks omitted) (citations omitted). "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Hartley v. Parnell,* 193 F.3d 1263, 1269 (11th Cir.1999) (internal quotation mark omitted). In short, "the standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." *Cottone,* 326 F.3d at 1360 (alteration in original) (internal quotation marks omitted).

*Keith v. DeKalb Cnty., Ga*, 749 F.3d 1034, 1047–48 (11th Cir. 2014).

As Burch points out, and the Plaintiffs do not dispute, he was not the Sheriff of Mobile County at the time of the underlying events, but was instead the "administrative chief" under the then-Sheriff, overseeing internal affairs and managing organizational matters for MCSO unrelated to the criminal division. (Doc# 63-2, PageID.586-589). The Plaintiffs have not cited any evidence indicating that

Burch personally participated in the search of 9711 Brooklyn's Way, the traffic stop of Lambert and Napier's vehicle, or the Plaintiffs' arrests,[12] nor have they cited evidence of "a history of widespread abuse" or a "custom or policy" that would justify the imposition of supervisorial liability on Burch. Accordingly, summary judgment is due to be granted in favor of Burch on the Plaintiffs' § 1983 claims for violations of the Fourth Amendment, for failure to show that he committed any such violation.

**2. Search of the Residence**

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. "[T]he Fourth Amendment's right of privacy has been declared enforceable against the States through the Due Process Clause of the Fourteenth…" *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961).

> Although searches and seizures inside a home without a search warrant are presumptively unreasonable, in *Payton v. New York,* 445 U.S. 573, 603, 100 S. Ct. 1371, 1388, 63 L. Ed. 2d 639 (1980), the Supreme Court held that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." … *Payton* requires a two-part inquiry to determine if entry pursuant to an arrest warrant complies with the Fourth Amendment's proscription of unreasonable searches. *See* [*United States v.*] *Magluta,* 44 F.3d [1530,] 1533[ (11th Cir. 1995)]. In particular, …

[12] Indeed, the only action by Burch relating to the underlying events that the Plaintiffs discuss in their response brief was his giving a televised interview about the search and arrests to a news channel the day after they happened. (*See* Doc# 76, PageID.845). This action appears related to the invasion-of-privacy and defamation claims the Plaintiffs were denied leave to amend their complaint to add against Burch.

> "first, there must be a reasonable belief that the location to be searched is the suspect's dwelling, and second, the police must have 'reason to believe' that the suspect is within the dwelling." *Id.* Elaborating on this inquiry, … "for law enforcement officials to enter a residence to execute an arrest warrant for a resident of the premises, the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry." *Id.* at 1535. Furthermore, "in evaluating this on the spot determination, as to the second *Payton* prong, courts must be sensitive to common sense factors indicating a resident's presence." *Id.* … [S]uch "common sense factors" must also guide courts in evaluating the first *Payton* prong.

*United States v. Bervaldi*, 226 F.3d 1256, 1262–63 (11th Cir. 2000). In short,

> law enforcement officers may enter a residence to execute an arrest warrant for a resident of the premises if the totality of the facts and circumstances within the officers' knowledge yielded a reasonable belief that: (1) the location to be searched is the suspect's dwelling; and (2) the suspect is within the residence. *United States v. Magluta*, 44 F.3d 1530, 1535 (11th Cir. 1995). In other words, the officers need not be "absolutely certain" that a suspect is at home before entering to execute an arrest warrant. *Id*. at 1538 … The officers may draw reasonable inferences and presumptions based on the time of day or observations at the scene, and these presumptions can be rebutted only by evidence to the contrary. *See Magluta*, 44 F.3d at 1535–36. "If officers have made such presumptions and have a reasonable belief that a suspect is present somewhere on the premises, they may search the entire premises of a residence, until the suspect is found." *United States v. Williams*, 871 F.3d 1197, 1201 (11th Cir. 2017). Further, "if the initial entry into the suspect's residence is lawful, the officers are permitted to seize any contraband in plain view within the residence." *Id.*

*United States v. Grushko*, 50 F.4th 1, 10–11 (11th Cir. 2022).

The Plaintiffs have failed to show that any of the Deputy Defendants committed a Fourth Amendment violation during the entry and search of Lambert

and Napier's home pursuant to the arrest warrant for Timmons, much less that the right was "clearly established" at the time. The Plaintiffs have largely not disputed the factors the Deputy Defendants cite to justify their belief that 9711 Brooklyn's Way was Timmons's dwelling and that he was within at the time of the search. While the Plaintiffs argue that those factors did not justify a reasonable belief, the undersigned disagrees.

At the time he had the arrest warrant updated with a Mobile County magistrate's approval to specifically include 9711 Brooklyn's Way,[13] Grimm knew

---

13 The Plaintiffs suggest that the judgment of Mobile County magistrates is unreliable because they "are not lawyers or judges[,] are subject to the administrative direction of the Clerk of the District Court[, and a] person serving within the District Clerk's office may be appointed by the clerk to serve as a magistrate." (Doc# 76, PageID.835). However, the Supreme Court has generally only required that a warrant signed by "a detached and neutral magistrate." *United States v. Leon*, 468 U.S. 897, 913, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). The Plaintiffs have cited no authority indicating that such an official must be a lawyer or judge to satisfy the Fourth Amendment. They have also cited no evidence indicating that the magistrate in this case was "a person serving within the District Clerk's office[,]" nor have they elaborated on how that, or Mobile County magistrates being "subject to the administrative direction of the Clerk of the District Court," purportedly affects their detachment and/or neutrality. Regardless, the Plaintiffs have never disputed that the arrest warrant itself was justified by Timmons's being suspected of murder, and, as the Plaintiffs themselves point out, an arrest warrant is not required to list every address known for a suspect. *See Bervaldi*, 226 F.3d at 1263 (stating it was not "significant that the arrest warrant listed [one] address" instead of a different one determined to be the suspect's dwelling (citing *United States v. Lauter*, 57 F.3d 212, 214 (2d Cir. 1995) as "rejecting argument that when police believe that the target of an arrest lives at an address other than the one listed on the warrant, they must apply for a new warrant before arresting the suspect at the new residence")).

To the extent the Plaintiffs' response suggests that either of the warrants at issue did not comply with certain Alabama laws or rules, any such non-compliance is irrelevant to determining whether the warrants satisfy constitutional requirements, and thus whether the Deputy Defendants can be held liable under § 1983. *See United States v. Gilbert*, 942 F.2d 1537, 1541–42 (11th Cir. 1991) ("In the instant case, we find no reason why we should hold the State Attorney's failure to designate Bounds

that Timmons, who was 18 or 19 at the time, had provided that as his address on an updated driver license issued about three weeks before the search, and it was also where his mother Lambert lived. *See Daker v. Steube*, 514 F. App'x 885, 888–89 (11th Cir. 2013) ("Undisputed evidence at trial showed Riley's belief that Sutherland resided at [his grandparents] the Dakers' address was reasonable. The warrant for Sutherland's arrest listed the Dakers' address. Before going to the home to execute the warrant, Riley checked Sutherland's driver's license address, which was the Dakers' address. Riley also checked recent booking records for Sutherland, which returned a recent booking record noting the Dakers' address as Sutherland's residence."). Renfroe and Rivers were also aware of this information at the time they and other members of the Special Operations team entered the residence, and that knowledge is imputed to Blackwood, who was part of that team. *See Illinois v. Andreas*, 463 U.S. 765, 772 n.5, 103 S. Ct. 3319, 77 L. Ed. 2d 1003 (1983) ("[W]here law enforcement authorities are cooperating in an investigation,…the knowledge of

---

or O'Neal on the search warrant to be an error of constitutional proportions. The state, after all, empowered both to make searches of this sort at this location, and would have permitted them to make this search if the State Attorney had drafted the warrant according to the state's requirements. More importantly, the error implicated none of the interests that the Fourth Amendment protects…[A]lthough this search may not have complied with certain conditions required by the state, it did not offend any constitutional principles that support the suppression of evidence."); *United States v. Simms*, 385 F.3d 1347, 1355–56 (11th Cir. 2004) ("Even if we assume that the use of the tracking device beyond the bounds of the warrant may have violated Texas state law governing the installation and use of mobile tracking devices, this still leaves us several steps away from being able to reach a conclusion that suppression is warranted. As we have earlier noted, 'constitutional considerations, rather than the demands of state law, direct our resolution of this issue.' *United States v. Gilbert*, 942 F.2d 1537, 1541 (11th Cir. 1991).").

one is presumed shared by all."); *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985) ("A reviewing court may examine the collective knowledge of law officers if they maintained at least a minimal level of communication during their investigation.").

Having a reasonable belief that Timmons resided at 9711 Brooklyn's Way, the evidence also shows no genuine issue of material fact that Blackwood, Renfroe, and Rivers also had a reasonable belief that Timmons was in that residence at the time of their entry. "Residency in a house…generally is not transitory or ephemeral, but instead endures for some length of time." *Bervaldi*, 226 F.3d at 1265 ("It was reasonable for the officers to believe that, because Deridder resided at 129th Avenue, he would reside there for some period of time."). Here, Timmons had provided 9711 Brooklyn's Way as his address on his driver license only about three weeks prior. *See id.* at 1266 ("[O]n the facts of this case, we believe that it was reasonable for the officers to believe that the residency extended for at least 6 months and 21 days…In the probable cause context, we have found that information can remain fresh for longer than the period of time at issue here."). Additionally, Grimm, who arrived as the Special Operations team was making entry into the residence, had determined it likely that an 18- or 19-year-old like Timmons wanted for a serious crime could reasonably be expected to hide out in a "safe refuge" such as a parent's house. While the Plaintiffs scoff at this reasoning as "subjectively com[ing] up with unsupported reasons how he thought the person to be served would be thinking" (Doc# 76,

PageID.838),[14] the undersigned finds it to be the sort of reasonable, common sense inference or presumption that law enforcement officers may rely on to reach a reasonable belief that a suspect is within a residence, and the Plaintiffs have not cited "evidence to the contrary" to rebut it.[15] *Grushko*, 50 F.4th at 10. The fact the crime was committed only five days prior to the search of 9711 Brooklyn's Way further

[14] The Plaintiffs also complain that the Deputy "Defendants' brief cites no legal authority to support Grimm's analysis as being sufficient to satisfy *Payton*'s first factor that his analysis provided him with a reasonable belief that Timmon resided at the address of Plaintiffs Lambert and Napier, nor did Defendants cite any legal authority as to the analysis being sufficient to satisfy *Payton*'s second factor that he had a reasonable belief that Timmon may be found at the address at the time the arrest warrant was to be executed." (Doc# 76, PageID.836). However, because the Deputy Defendants have invoked qualified immunity and shown they were acting within their discretionary authority, the burden is on the Plaintiffs to cite legal authority "clearly establishing" that their beliefs were not reasonable.

[15] While Timmons had provided an address in Chickasaw, Alabama, when he was booked into Mobile County Metro Jail—the address that was initially on his arrest warrant—that does not undermine Grimm determination. The Plaintiffs have presented no evidence or argument as to why that address should more strongly have been considered Timmons's dwelling over 9711 Brooklyn's Way, and regardless a suspect be deemed to "reside" at more than one address. *See Bervaldi,* 226 F.3d at 1263 ("[E]ven if the 132nd Place address was his 'permanent residence' in some sense, that is not inconsistent with Deridder's residence at the 129th Avenue address. *See United States v. Risse*, 83 F.3d 212, 217 (8th Cir. 1996) ('[W]e reject Risse's contention that, because the officers knew, or should have known, that Rhoads maintained a permanent residence on Knoll Street, they could not have reasonably believed that Rhoads resided on Huntington Road.')."); *United States v. Bellamy*, 456 F. App'x 863, 865 (11th Cir. 2012) (per curiam) (unpublished) ("[T]he suggestion of other possible addresses does not invalidate the reliability of…information [that a certain apartment was the suspect's residence]. *See Bervaldi,* 226 F.3d at 1266 (concluding that evidence of defendant's permanent address 'does little to undermine the officers' reasonable belief that [the defendant] actually resided [elsewhere], and that he merely used his parents' address for various documents, such as his driver's license').").

supports a reasonable belief that Timmons was still there. That officers never actually observed Timmons at the residence prior to the search does not render their belief unreasonable, given that Timmons was wanted for a serious crime and could reasonably be expected to hide from authorities. *See Magluta*, 44 F.3d at 1538 ("[T]he officers were entitled to consider that Magluta was a fugitive from justice, wanted on a 24 count drug trafficking indictment, who might have been concealing his presence. This could explain why the marshals never saw Magluta during their observation, and why he might not have been spotted previously. Hence, the lack of direct evidence that Magluta had been seen that day does not eviscerate the marshals' reasonable conclusion that he was at home."); *United States v. Beck*, 729 F.2d 1329, 1332 (11th Cir. 1984) (per curiam) ("The fact that no one responded to Leary's knock and announcement did not mean that no one was home since it was reasonable to expect a fugitive to hide or flee if possible. Thus, the entry to search for Beck was reasonable.").

The actions of other occupants of a suspect's residence is also a permissible factor for law enforcement to consider in determining reasonable belief that the suspect is actually there. *See Daker*, 514 F. App'x at 889 ("When he asked, twice, who was home with Mr. Daker, rather than telling Riley that Mrs. Daker was home, Mr. Daker repeated, 'I told you already, he's in Washington.' The Dakers argue that, when Mr. Daker told Riley that Sutherland was out of town, Riley had no reason to disbelieve that statement, so he thereafter lacked a reasonable belief that Sutherland was at the residence. But based on his observations at the home, Mr. Daker's

uncooperative nature, and the facts he ascertained before service showing the Dakers' home was Sutherland's residence, it was reasonable for Riley to disbelieve Mr. Daker. For these reasons, Riley was lawfully executing a legal duty by entering and searching the Dakers' residence to locate and arrest Sutherland."). The record indicates that Coleman informed Grimm of Napier's actions while the FBI Task Force was observing 9711 Brooklyn's Way—his taking pictures of the agents' vehicles, and asking the agents when MCSO was planning to execute a warrant on the address. It was reasonable for Grimm to believe that these actions were intended to assist Timmons in evading capture, and that they were additional indicators that Timmons was in fact in the residence.

The Plaintiffs argue that the Supreme Court's decision in *Steagald v. United States*, 451 U.S. 204, 101 S. Ct. 1642, 68 L. Ed. 2d 38 (1981), clearly established that an arrest warrant for an individual is not, in the absence of exigent circumstances, sufficient under the Fourth Amendment "to justify an entry into a [different] person's home to arrest him without a warrant, or a search of a home for objects in the absence of a search warrant." 451 U.S. at 213. However, in *Steagald*, federal agents relied on an arrest warrant for one individual, Ricky Lyons, as the sole "legal authority to enter the home of a third person[, Steagald,] based on their belief that Ricky Lyons might be a *guest* there[,]" and used evidence uncovered during the search of Steagald's home for Ricky Lyons to convict Steagald. *Id.* at 212-13 (emphasis added). In this case, the Deputy Defendants operated under the belief that Timmons *resided* at Lambert and Napier's address, and was not simply a guest there. As the Deputy Defendants

correctly point out in their reply, the Eleventh Circuit has recognized this distinction, holding that when "officers had a reasonable belief that [a] residence was [an arrest warrant subject]'s residence, not some third party's residence as in *Steagald*, and that he was there at the time…, *Payton*, not *Steagald*, applies." *Bervaldi*, 226 F.3d at 1267 n.11.

The Plaintiffs also argue that *Bervaldi* clearly established that the Deputy Defendants could not base their determination that 9711 Brooklyn's Way was Timmons's dwelling on the fact that Timmons had provided this address on his driver license, because that case recognized that it "is not unusual" for young adults like Timmons "to use their parents' address for records, such as driver's licenses, official mailing address, et cetera, because in a sense it may be a more permanent or fixed address than the address of their own residence. For example, oftentimes university students or law clerks in their twenties use their parents' address while studying or clerking." *Id.* at 1263. However, that observation was made in determining whether officers had a reasonable belief that the 27-year-old suspect, Deridder, resided at an address *different* from his parents' address, which was the one provided on his driver license and in other official records. *Id.* The *Bervaldi* panel held that the officers did, finding that, "[d]espite the Autotrac reports and driver's license records indicating that Deridder's address was 132nd Place, there was strong evidence indicating that Deridder in reality resided at 129th Avenue"—specifically, "the officers' observation of Deridder at the 129th Avenue residence and his statements to them [in a

conversation predating the search] that he resided there and that the 132nd Place address was his parents' address." *Id*.

In short, the officers in *Bervaldi* had to justify their belief that the address listed on a young adult suspect's driver license, which was also his parents' address, was *not* his actual residence—implying that such factors would ordinarily justify a belief that a young adult suspect resides at that address. Regardless, the *Bervaldi* panel also recognized that a suspect can reasonably be found to reside in multiple locations. *See* n.15, *supra*. Therefore, *Bervaldi* did not "clearly establish" that the Deputy Defendants' belief that then-18- or 19-year-old Timmons resided at 9711 Brooklyn's Way, his mother's address and the one he had recently provided on his driver license, was unreasonable. To the contrary, it lends support to the reasonableness of that belief.

Finally, while the Plaintiffs' complaint alleges that Thornton played a larger role in the underlying events, the evidence on summary judgment indicates that Thornton's only actions relevant to the Plaintiffs' case was securing a search warrant for 9711 Brooklyn's Way at the request of Grimm following entry of the residence based on Grimm's viewing unspecified evidence. (*See* Doc# 77-9, PageID.907). The Plaintiffs present no evidence or argument to suggest that the search warrant was invalid, or that the evidence that prompted Grimm to request the warrant was not in plain view or was not suspicious enough to justify a search warrant. *See Magluta*, 44 F.3d at 1538 ("Once the marshals possessed…valid justification to enter the residence they were entitled, pursuant to *Maryland v. Buie*, 494 U.S. 325, 110 S. Ct. 1093, 108

L. Ed. 2d 276 (1990), to engage in a protective sweep of the premises. Any evidence discovered in plain view during the sweep was properly used to secure a search warrant for the premises.").

For the foregoing reasons, summary judgment is due to be granted in favor of Blackwood, Grimm, Renfroe, and Thornton on the Plaintiffs' § 1983 claims for violations of the Fourth Amendment related to the entry and search of 9711 Brooklyn's Way, on the basis of qualified immunity.

### 3. Traffic Stop

> "[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow,* 528 U.S. 119, 120 S. Ct. 673, 675, 145 L. Ed. 2d 570 (2000) (citing *Terry v. Ohio,* 392 U.S. 1, 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). Furthermore, "[w]hile 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Id.* at 675–76 (citing *United States v. Sokolow,* 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L.Ed.2d 1 (1989)). A law enforcement official who reasonably but mistakenly concludes that reasonable suspicion is present is still entitled to qualified immunity. When an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had "arguable" reasonable suspicion to support an investigatory stop. *See Williamson v. Mills,* 65 F.3d 155, 157 (11th Cir.1995); *Swint v. The City of Wadley, Alabama,* 51 F.3d 988, 996 (11th Cir.1995); *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1558 (11th Cir.1993).

*Jackson*, 206 F.3d at 1165–66 (footnote omitted). An officer's "subjective purpose for conducting the traffic stop is immaterial. Under the reasonable suspicion standard,…[w]e need only consider whether, given the totality of the circumstances,

an objective and particularized basis for the stop existed." *Bradley*, 10 F.4th at 1239. Additionally, "during a lawful traffic stop, an officer may order the driver out of the vehicle." *Baxter v. Roberts*, 54 F.4th 1241, 1262 (11th Cir. 2022) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977)).

The Deputy Defendants argue, and the Plaintiffs do not dispute, that Rivers is the only defendant potentially liable for the traffic stop since he was the one who effectuated it, with Renfroe arriving afterwards. As to Rivers's liability, the only argument the Plaintiffs put forth in their response is that "Rivers, in having failed to apply the factors of Payton as to whether there was a reason to believe Timmons was in the home of Plaintiffs Lambert and Napier, and without Plaintiff Lambert having violated any traffic laws, stopped her vehicle on a hunch that Timmons might be in the vehicle." (Doc# 76, PageID.843). However, as explained above, Rivers *did* have reasonable suspicion to believe that Timmons was in 9711 Brooklyn's Way with Lambert and Napier that day. Given this, Rivers had "reasonable, articulable suspicion" that Timmons could have been concealed within the vehicle, and that criminal activity, at least in the form of hindering prosecution in the first degree, was afoot. *See* Ala. Code § 13A-10-43(a) ("A person commits the crime of hindering prosecution in the first degree if with the intent to hinder the apprehension, prosecution, conviction or punishment of another for conduct constituting a murder or a Class A or B felony, he renders criminal assistance to such person."); Ala. Code § 13A-10-42(1) ("For the purposes of Sections 13A-10-43 through 13A-10-45, a person renders 'criminal assistance' to another if he: (1) Harbors or conceals such person[, or]

(3) Provides such person with money, transportation, weapon, disguise or other means of avoiding discovery or apprehension…”).[16]

Accordingly, summary judgment is due to be granted in favor of Blackwood, Grimm, Renfroe, and Thornton on Lambert and Napier's § 1983 claims for violations of the Fourth Amendment related to the traffic stop of their vehicle, on the basis of qualified immunity.

### 4. Arrests

> An officer violates a person's Fourth Amendment right against unreasonable seizures if the officer arrests that person without probable cause to make the arrest. *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007). Probable cause is established where facts, “derived from reasonably trustworthy information, are sufficient to cause a

[16] The Plaintiffs' response cites an affidavit by a neighbor of 9711 Brooklyn's Way who claims he observed law enforcement officers arrive at the residence within minutes of Lambert and Napier's departure and commence forceful entry of the residence. This contradicts the Deputy Defendants' assert that law enforcement only entered the residence after determining that Timmons was not in the Mercedes with Lambert and Napier. The Plaintiffs appear to argue that officers could not reasonably believe that Timmons was both in the residence and in the Mercedes at the same time, and that thus either the traffic stop or the residence entry violated the Fourth Amendment. However, officers “need not be ‘absolutely certain’ that a suspect is at home before entering to execute an arrest warrant[,]” *Grushko*, 50 F.4th at 10, and only “reasonable, articulable suspicion that criminal activity is afoot”—which is “considerably less than a preponderance of the evidence”—is needed to conduct an investigatory stop of a vehicle. *Jackson*, 206 F.3d at 1165. Even accepting as true the neighbor's version of when entry of the residence occurred, given the circumstances and exigencies of this case—in particular, that the Mercedes had left from a closed garage attached to a residence where a murder suspect was believed to be hiding—a reasonable officers could simultaneously have both “reasonable suspicion,” based on “less than a preponderance of the evidence,” that Lambert and Napier were attempting to assist Timmons with evading capture by law enforcement by driving away with him concealed in their car, and also a reasonable belief, without being absolutely certain, that Timmons was also still at the residence and could possibly be planning to escape while the Mercedes distracted law enforcement. At the very least, the Plaintiffs have cited no authority, much less binding authority in existence on October 26, 2022, clearly holding to the contrary.

person of reasonable caution to believe that a criminal offense has been or is being committed." *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010). "[T]he correct legal standard to evaluate whether an officer had probable cause to seize a suspect is to 'ask whether a reasonable officer could conclude ... that there was a substantial chance of criminal activity.' " *Washington v. Howard*, 25 F.4th 891, 902 (11th Cir. 2022) (quoting [*Dist. Of Columbia v.* ]*Wesby*, [583 U.S. 48,] 138 S. Ct. [577,] 588[, 199 L. Ed. 2d 453 (2018)]).

But to establish the defense of qualified immunity for a false arrest claim,…"an officer need not have actual probable cause, but only 'arguable' probable cause." *Brown*, 608 F.3d at 734 (internal citation omitted). An officer has *arguable* probable cause if "a reasonable officer, looking at the entire legal landscape at the time of the arrests, could have interpreted the law as permitting the arrests." *Wesby*, 138 S. Ct. at 593. An officer lacks arguable probable cause only if "the state of the law on the date of the alleged misconduct makes it obvious that the [officer's] acts violated the plaintiff's rights in the specific set of circumstances at issue." *Washington*, 25 F. 4th at 903 (quotation omitted). Accordingly, "the dispositive question is whether it was already clearly established, as a matter of law, that at the time of Plaintiff's arrest, an objective officer could not have concluded reasonably that probable cause existed to arrest Plaintiff under the particular circumstances Defendants confronted." *Gates v. Khokhar*, 884 F.3d 1290, 1303 (11th Cir. 2018) (emphasis omitted).

…

Under the "any-crime rule" an officer is "insulate[d] from false-arrest claims so long as probable cause existed to arrest the suspect for *some* crime, even if it was not the crime the officer thought or said had occurred." *Williams v. Aguirre*, 965 F.3d 1147, 1158 (11th Cir. 2020). Applying the "any-crime rule" to qualified immunity, an officer is entitled to qualified immunity if he had arguable probable cause to arrest a suspect for any crime, even if that crime was not " 'the offense announced by the officer at the time of the arrest.' " *Lee v. Ferraro*, 284 F.3d 1188, 1195–96 (11th Cir. 2002) (quoting *Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty.*, 956 F.2d 1112, 1119 n.4 (11th Cir. 1992).

> The existence of actual or arguable probable cause "depends on the elements of the alleged crime and the operative fact pattern." *Brown*, 608 F.3d at 735 (citing *Skop*, 485 F.3d at 1137−38). To determine whether an official had actual or arguable probable cause for an arrest, "we must look at the totality of the circumstances," *Washington*, 25 F.4th at 902 (quotation omitted), including what the officials knew at the time of the arrest. *Wesby*, 138 S. Ct. at 592…

*Garcia v. Casey*, 75 F.4th 1176, 1186-88 (11th Cir. 2023) (footnote omitted). When analyzing "arguable probable cause," a court "must ask whether 'a reasonable officer, looking at the entire legal landscape at the time of the arrests, could have interpreted the law as permitting the arrests.' " *Id.* at 1187 (quoting *Wesby*, 138 S. Ct. at 593).

The Deputy Defendants argue that "arguable probable cause" existed to arrest all three Plaintiffs. The Plaintiffs neither acknowledge this argument, nor otherwise address their Fourth Amendment claims based on their arrests, in their response, and the undersigned agrees that the Deputy Defendants involved in the arrests are entitled to qualified immunity on these claims. The Deputy Defendants had arguable probable cause to arrest Napier at the time for unlawful carrying of a pistol without a license or permit in violation of Alabama Code § 13A-11-73(a) ("Except on land under his or her control or in his or her own abode or his or her own fixed place of business, no person shall carry a pistol in any vehicle or concealed on or about his or her person without a permit issued under Section 13A-11-75(a)(1) or recognized under Section 13A-11-85."), *repealed effective Jan. 1, 2023*, Ala. Act 2022-133, § 9(2), as it is undisputed that Napier admitted during the traffic stop that a firearm found during the search of the Mercedes was his and that he did not have a permit for it. It is also undisputed that Powe was the subject of two outstanding warrants at the time

she was arrested. Thus, her claim for false arrest fails. "Under Eleventh Circuit precedent, the issuance of a warrant constitutes legal process, and so a plaintiff who claims false arrest pursuant to a warrant is making a claim of malicious prosecution rather than false arrest. *See Calero–Colon v. Betancourt–Lebron*, 68 F.3d 1, 4 (1st Cir. 1995) (holding adopted by the Eleventh Circuit in *Whiting v. Traylor*, 85 F.3d 581, 585 (11th Cir. 1996) ) ('As a general rule, an unlawful arrest pursuant to a warrant will be more closely analogous to the common law tort of malicious prosecution.... On the other hand, wrongful warrantless arrests typically resemble the tort of false arrest.')." *Giles v. Manser*, 757 F. App'x 891, 895 (11th Cir. 2018) (per curiam) (unpublished) (affirming dismissal of false arrest claim because the plaintiff "was arrested pursuant to a warrant").

The Deputy Defendants argue that there was arguable probable cause to arrest Lambert for obstructing governmental operations in violation of Ala. Code § 13A-10-2(a) ("A person commits the crime of obstructing governmental operations if, by means of intimidation, physical force or interference or by any other independently unlawful act, he: (1) Intentionally obstructs, impairs or hinders the administration of law or other governmental function; or (2) Intentionally prevents a public servant from performing a governmental function.") because she refused orders to exit the Mercedes. *See United States v. Spoerke*, 568 F.3d 1236, 1248 (11th Cir. 2009) ("During a lawful traffic stop, officers…may take steps that are reasonably necessary to protect their personal safety, including requiring the driver and passengers to exit the vehicle as a matter of course." (citation and quotation omitted)). However, since even under

the Deputy Defendants' version of events such obstruction would have been to prevent Timmons's arrest, they cannot claim arguable probable cause under § 13A-10-2 because that "section does not apply to the obstruction, impairment or hindrance of the making of an arrest." Ala. Code § 13A-10-2(b). Nevertheless, as explained above, the Deputy Defendants had arguable probable cause to conduct the traffic stop under the reasonable belief that Lamber was hindering prosecution in the first degree in violation of Ala. Code § 13A-10-43(a). Thus, there was arguable probable cause to arrest Lambert for that crime as well, especially once she refused commands to exit the vehicle.[17]

Accordingly, summary judgment is due to be granted in favor of Blackwood, Grimm, Renfroe, and Thornton on the Plaintiffs' § 1983 claims for violations of the

[17] To the extent the complaint alleges that the Deputy Defendants conspired to violate rights under § 1983, the "intracorporate conspiracy doctrine" bars such claims because all of those defendants are or were employees of the same agency, the MCSO. *See Denney v. City of Albany*, 247 F.3d 1172, 1190 (11th Cir. 2001) (" 'The intracorporate conspiracy doctrine holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy. Simply put, under the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves.' *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (en banc). The doctrine applies to public entities such as the City and its personnel." (42 U.S.C. § 1985(3) conspiracy)); *Rehberg v. Paulk*, 611 F.3d 828, 854 (11th Cir. 2010) (similar for § 1983 conspiracy), *aff'd*, 566 U.S. 356 (2012). Moreover, as noted previously, there is no evidence Burch was involved in either the traffic stop, the arrests, or the residence search underlying the Plaintiffs' claims, and the other Deputy Defendants cannot be liable for conspiring to commit § 1983 violations for which they are entitled to qualified immunity. *See Rehberg*, 611 F.3d at 854 ("Rehberg cannot state a valid conspiracy claim by alleging the Defendants conspired to do things they already are immune from doing directly.").

Fourth Amendment related to their arrests and imprisonment, on the basis of qualified immunity.

### c. State Law Claims

In Alabama, "[s]overeign immunity, which is provided by Article I, § 14 of the Alabama Constitution,…prohibits actions against the State[ and] provides nearly absolute protection from state law claims. *See Patterson v. Gladwin Corp.*, 835 So.2d 137, 142 (Ala. 2002) ('The wall of immunity erected by § 14 is nearly impregnable.'). []Sheriffs, as constitutional officers, have sovereign immunity under Alabama law because actions against them are viewed as actions against the State. Deputies also have sovereign immunity because they carry out their sheriff's duties and thus are treated as constitutional officers." *LeFrere v. Quezada*, 582 F.3d 1260, 1265–66 (11th Cir. 2009). *Accord, e.g.*, *Johnson v. Conner*, 720 F.3d 1311, 1313 (11th Cir. 2013) ("Pursuant to its state constitution, Alabama grants sovereign immunity to its state executive officers. Ala. Const. art. I, § 14. Section 14 provides that the State of Alabama shall never be made a defendant in any court of law or equity. Under Alabama law, sheriffs and deputy sheriffs are considered executive officers of the state, and are therefore immune from suit in both their official and individual capacities." (citation omitted)); *Ex parte Blankenship*, 893 So. 2d 303, 305 (Ala. 2004) ("Where it is undisputed that a deputy sheriff is 'acting within the line and scope of his employment ... at the time [he is involved in an automobile] accident' with the plaintiff, § 14, Ala. Const.1901, bars an action against the deputy sheriff for damages arising out of the accident. *Ex parte McWhorter*, 880 So. 2d at 1117. This is so, because

an action against a sheriff—or a deputy sheriff—for damages arising out of the performance of his duties is ' "essentially a suit against the state." ' *Parker v. Amerson*, 519 So. 2d 442, 445 (Ala.1987) (quoting *Montiel v. Holcombe*, 240 Ala. 352, 354, 199 So. 245, 245 (1940)); *accord Drain v. Odom*, 631 So.2d 971, 972 (Ala.1994) ('deputy sheriffs are immune to the same extent as sheriffs')."").

The Deputy Defendants argue that they are entitled to state sovereign immunity on the Plaintiffs' state law claims for false imprisonment and malicious prosecution in Counts VI and VII. The Plaintiffs do not dispute that argument, and the record shows no genuine dispute of material fact that Burch and the Deputy Defendants were at all times relevant to those claims performing their official duties as Mobile County deputy sheriffs. Accordingly, summary judgment is due to be granted in favor of Burch and the Deputy Defendants on the state-law claims in Counts VI and VII.

In accordance with the foregoing analysis, the "Motion for Summary Judgment" filed November 22, 2024 (Doc# 20), is due to be **GRANTED** as to the Deputy Defendants, such that all claims against those defendants be **DISMISSED with prejudice**, except for Lambert and Napier's Fourth Amendment claims under § 1983 for excessive damage to their residence during the October 26, 2022 search,[18] which remain pending because they were not addressed in the present motion.

---

[18] *See Pena v. Marcus*, 715 F. App'x 981, 986 (11th Cir. 2017) (per curiam) (unpublished) ("Under the Fourth Amendment, officers have discretion in executing a search warrant. *Dalia v. United States*, 441 U.S. 238, 257, 99 S. Ct. 1682, 60 L. Ed. 2d 177 (1979). They may not cause 'excessive or unnecessary destruction of property,' [*United States v.* ]*Ramirez*, 523 U.S. [65,] 71, 118 S. Ct. 992[, 140 L. Ed. 2d 191 (1998)],

**DONE** this the **2nd** day of **October 2026**.

*/s/ Katherine P. Nelson*
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**

---

but courts recognize that "officers executing search warrants on occasion must damage property in order to perform their duty." *Dalia*, 441 U.S. at 258, 99 S. Ct. 1682. *See also United States v. Andreu*, 715 F.2d 1497, 1499–1501 (11th Cir. 1983). To determine whether officers damaged property in violation of the Fourth Amendment, courts examine the reasonableness of the officers' actions. *Ramirez*, 523 U.S. at 71–72, 118 S. Ct. 992.").